# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF THE UNITED STATES
### HOUSTON DISTRICT

United States Court
Southern District of Texas

| | | |
|---|---|---|
| PRESTON HUGHES, III | * | NOV 2 1 2001 **LF** |
| TDCJ ID # 000939, | * | |
| Petitioner | * | ~~Michael N. Milby Clerk~~ |
| v. | * | |
| | * | |
| GARY JOHNSON, Director | * | **H -01-4073** |
| Texas Department of Criminal | * | |
| Justice, Institutional Division | * | |
| Respondent | * | |

## ORIGINAL PETITION PURSUANT TO
## 28 U.S. SECTION 2254, WITH ATTACHED
## BRIEF AND EXHIBITS IN SUPPORT

Patrick F. McCann
TBA# 00792680
3700 N. Main
Houston, Texas 77009
713-223-3805
Counsel for Petitioner

Marc C. Carter
TBA# 00787212
909 Fannin, Ste 1650
Houston, Texas 77002
713-425-4304
Co-counsel for Petitioner

## THIS IS A DEATH PENALTY CASE

COMES NOW THE APPLICANT, by and through his attorneys of record, and offers this, his Original Writ Petition.  In support thereof the Applicant would show this Honorable Court the following:

Petition information:

1. Name and location of the court which entered the judgement of conviction under attack: 174th District Court of Harris county, Texas, at 1201 Franklin, Harris County Criminal Justice Center.
2. Date of judgement of conviction: May, 1989.
3. Sentence: Death.
4. Nature of offense: Capital murder.
5. Plea entered: Not guilty.
6. Kind of trial: Jury.
7. Petitioner testified at punishment.
8. Direct appeal was taken to the Texas Court of Criminal Appeals.
9. Name of Court to which appeal was taken: Court of Criminal Appeals, at Austin, Texas. The appeal was originally granted and the case reversed and remanded for jury selection error. On a Motion for Rehearing by the State, the original opinion was vacated and the conviction affirmed. See *Hughes v. State,* 878 S.W.2d 142 (Tex. Crim. App. 1993).
10. The Petitioner has previously filed one state habeas petition pursuant to Article 11.071 of the Texas code of Criminal Procedure.
11. A] The Original Petition was filed in the convicting court, the 174th District Court of Harris County.
    B] *Ex parte Hughes,* Number 511676-A
    C] Grounds raised: see attached copy of state petition.
    D] No hearing was held on the petition. No subsequent petition in state court has been filed. After the district trial court makes its recommendations and findings the case is referred up to the Court of Criminal Appeals in Austin.  Once decision is taken there is no further remedy in state court.

Grounds for relief; see attached Brief and Memorandum in support of Petition.

12. Reasons for any previously not presented claims: see brief and memorandum.
13. No other petitions are pending in either state or federal court.

14. Names and addresses of all attorneys at all stages of representation:
    a. Trial : Ellis McCullough, Houston, Texas; Alfred Thomas, 2026 Elemen, Houston, Texas.
    b. Appeal: Joe Finkel, 2000 Smith, Houston, Texas.
    c. Post-conviction: Dick Whelan, 440 Louisiana, Houston, Texas.

15. The Petitioner was sentenced on one count of one indictment.

16. The Petitioner has no future sentence to serve should this conviction be vacated.

WHEREFORE, PETITIONER prays that this Honorable Court grant the relief to which he may entitled to in this proceeding.

Attorney for Petitioner
3700 N. Main
Houston, Texas 77009
TBA 00792680
(713) 223-3805
(713) 236-8801 Fax

Marc C. Carter, co-counsel
TBA # 00787212
909 Fannin, Stuite 1650
Houston, Texas 77010
(713) 425-4304
(713) 425 4314 Fax

3

## VERIFICATION

I certify that the foregoing is true and correct under penalty of perjury.

_Preston Hughes III_
Preston Hughes III

# BRIEF IN SUPPORT OF 2254 PETITION

## PREFACE OBJECTIONS

The Petitioner, by and through his attorneys of record, objects to the constitutionality of the Anti-terrorism and Effective Death Penalty Act of 1996 [AEDPA] timelines as imposed upon this case for the following reasons:

1) The Petitioner was without counsel for the period of August 2 until Sept 16 of 1996, as shown in attachment, and the AEDPA timelines should be equitably tolled for that period, permitting an additional 45 days from this initial Petition.

2) The Petitioner was deprived of counsel due to the moral objections of his initial state writ attorney, Mr. Randy McDonald. He objected to a system that he believed to be an unjust deprivation of the Petitioner's right to review of his claims under both the new 11.071 statute in Texas and the provisions of the AEDPA limitations. Subsequent events have proven him correct, and the new statutes have effectively robbed all claimants of the right to review the legality of their confinement and execution. [See affidavit of Randy McDonald.] For the reasons outlined the statute should be tolled for the period from April 24, 1996, until Mr. McDonald's resignation and removal, and

4

the subsequent appointment of second habeas counsel, Mr. Dick Whelan. This would provide approximately six months additional time to investigate, develop, and file this case.

3) The AEDPA timelines are unreasonable and violate the 10th amendment to the United States Constitution as they impermissibly constrain the right of state petitioners to first seek review in their own courts. Under the current system a federal Petitioner may not seek a subsequent petition in state court nor may he seek certiorari from the Supreme Court, without risking the time running.

4) The timelines are unreasonable in this case under the Eighth and Fourteenth Amendments since the matter is over twelve years old. Imposing such timelines in this case would work manifest injustice. The Petitioner grew up out of state, and many of the witnesses at his trial were from New York and so are particularly difficult to track down. The Petitioner was never examined psychologically prior to this phase of the process; and no real fact development took place at the state level other than that done by Mr. McDonald, who eventually resigned out of disgust with the system. The undersigned counsel have diligently requested volumes of records, engaged a psychiatrist and an investigator, requested forensic and pathologist assistance, and have

5

attempted to contact each and every witness and juror in this case. However, again due to the passage of time and the inertia of modern bureaucracy the results of these efforts have not been fully realized. Counsel in this case were appointed October 19, 2000, and so have had only five months to develop the facts in this case. That is neither reasonable nor just in a case where a man's life hangs in the balance. At minimum, a reasonable tolling or authorization to supplement the record or amend the petition would serve the interests of justice in this matter. [See attached affidavit of Investigator Vargas.]

5) The Petitioner will file separate motions to toll, and to amend, to supplement the record, and for discovery in order to fully develop this case. However, in order to make this Honorable Court aware of the problems herein, and to preserve this issue for future litigation, the Petitioner is compelled to raise these issues now.

Wherefore, as part of this Petition, and under protest, this Petition is hereby filed only to avoid default of the AEDPA timelines and preserve federal review of the Petitioner's claim. The Petitioner respectfully prays that this Honorable Court will grant an equitable tolling of the AEDPA timelines in this matter for either 45, 60, 90, or 180 days, in the interests of justice, and treat any further filing as an initial petition. Further the Petitioner prays that

this Honorable Court will permit supplementation of the record under Habeas Rule 7, and also permit discovery as contemplated under Rule 6. Should the records and other fact findings develop additional or altered claims the Petitioner requests that he be permitted to file an amended petition under Federal Rule of Civil Procedure 15.

## I. STATEMENT OF THE CASE

Applicant was convicted of capital murder under Section 19.03 (a) (6) in the 174th District Court of Harris County, Texas, J. Godwin, presiding, on May 4, 1989.  On direct appeal to the Court of Criminal Appeals at Austin, Texas his case was reversed for the trial court's failure to exclude a juror who could not understand the meaning of "probability" as required under one of the two special issues under Texas Code of Criminal Procedure, Art. 37.071.   On rehearing the Court of Criminal Appeals reversed itself, withdrew its earlier opinion, and affirmed the conviction. On collateral review, an initial skeletal writ was filed by appointed attorney R. E. Whelan on October 21, 1996, 180 days after the passage of the Anti-Terrorism and Effective Death Penalty Act of 1996.  No subsequent or further filing was done, and on September 13, 2000 the Court of Criminal Appeals denied relief in a one-page order.  No hearing or independent fact-finding was conducted.  On October 19, 2000, this Honorable Court, after request by the

Petitioner, appointed the undersigned counsel in this matter, and this Petition results.

## II. BRIEF RECITATION OF THE FACTS

**This is a case of coerced confessions being used to lure a jury into convicting a man on evidence that did not exist.**

What is not in dispute is that on the evening of Sept 26, 1988, two young people, 15-year old Shandra Charles and her three-year-old cousin Marcell Taylor were found in a wooded pathway between an apartment complex and a Fuddrucker's restaurant on South Kirkwood in Houston, Texas. Both had been stabbed. Marcell was pronounced dead at the scene but Shandra managed to survive awhile.   An officer on the scene, PO Hamilton, stated Charles said the name "Preston", and that after she was taken from the scene by paramedics. They went to the nearby apartment complex, woke the manager, and asked to look through the lease records to see if there was anyone named Preston on site. They found Mr. Hughes, and went to his apartment less than two hours after the initial report of the injured children.

Once there the detectives asked Mr. Hughes if he knew a girl named Shandra. He replied that he did know someone, and the police asked him to

accompany them downtown to answer questions regarding the case.  At this point the accounts diverge significantly.

Per Mr. Hughes testimony, and his affidavit, and his claim filed with the Houston Police Department Internal Affairs division, the officers entered his apartment and began to search it while he had agreed to travel with them to the station. He stated that they were searching his place before he had even gone to get his clothes, and that he never gave them consent to take his possessions or to search his residence. [See Affidavit of Preston Hughes.]

Once they arrived at the police station, per Mr. Hughes' testimony and his affidavit, the lead detective, Sgt. Gafford, struck and threatened him if he did not admit to the killings.  Then an unknown large detective introduced himself as Sgt. "Garrison", and told Mr. Hughes that he would kill him if he did not confess.  Mr. Hughes later learned at the Motion to Suppress that this individual was named Yanchak, and that he was in fact a Houston Police Homicide detective.  Mr. Hughes had been drinking that night after work. He had been drunk enough, in fact, to have passed out on the Westheimer bus which went past his stop and he had to take a cab from the end of the line on Route 6 back to this apartment. [See Affidavit of Mr. Hughes, and also pretrial testimony at Motion to Suppress hearing] Frightened and

confused, without a lawyer, Mr. Hughes eventually caved in to the coercive tactics used by the police and gave a statement that appeared to incriminate him in at least the stabbing of Charles. [See attached Statement of Person in Custody #1.] Afterward he was returned to the Houston Police Department jail on 61 Reisner, where he was brutally beaten by the jail attendants. [See IAD complaint and written responses of officers] He was kicked and punched repeatedly, and left half-concious in his cell until the morning shift of Homicide came on duty. Realizing their counter-parts had not frightened a sufficient false admission from Mr. Hughes, the new crew came and retrieved their beaten suspect and now tried to force a statement more in line with their report.  Thus a second statement came into being that contradicted the first. [See Second Statement of Person in Custody by Preston Hughes].

In this statement the police accounted for the body of the young boy. What they neglected to realize, and what will be pointed out later under the claim against the coerced statements, is that this second statement directly contradicted all the physical and scene evidence. However, they at least had the basis for a capital charge now.

It was here also that the illegal search and seizure of his residence took shape. During the first statement, Mr. Hughes states that he had willingly given a written consent to take blood and hair for comparison

purposes in order to rule himself out as a suspect.  However, the police then took his signature for THAT form and xeroxed it onto a blank consent to search form, which they then filled in. [See affidavit of Mr. Hughes and testimony at trial during the suppression hearing, RR Vol. II-III].

Now the police had two coerced false statements, and a forged consent to search form for Mr. Hughes home.  They employed this to justify the items that they believed would link Mr. Hughes to the crime, namely the clothes Mr. Hughes had worn that night, a pair of eyeglasses, and a sheath knife that they believed to be the murder weapon. The sad flaw in this theory was that those items never revealed any trace of human blood at trial. [RR. IX, 435-470] Nor was there ever any forensic evidence that linked him to the victims.

Still this was not enough for the police.  Mr. Hughes' affidavit clearly states that when he left his apartment to join the police there was no pair of eyeglasses in the couch in his front room.   [See affidavit of Preston] However, there is clearly a pair of such glasses in the crime scene unit photos taken hours later.  The prosecutor and police attempted to connect Mr. Hughes with the deceased Shandra by claiming this was her pair of eyeglasses at trial. [RR. IX, 400-405] There was no forensic evidence to make this connection as the glasses had no fingerprints of the deceased nor

11

blood on them at all. This begs the question of whether, even if one assumes the police-coerced statements are correct, they never mention glasses, nor would there be any reason for those glasses to have been at his apartment! If Mr. Hughes *had* committed the killings as per his statement, then they happened at the wooded lot between the restaurant and his apartment building during a violent struggle.   How then does a stray pair of miraculously undamaged eyeglasses wind up hundreds of yards from their original location, without a trace of the blood of the deceased on them, and neatly folded into a couch cushion just visible enough to get a picture?

At trial the police never even tested the items they seized until forced to do so by defense request.   The Houston Police Department chemist actually conducted the test on the knife in court on the day of the trial! [RR IXX-435-470] Even the trial judge commented on how bizarre and unacceptable such behavior was. [RR IXX-444] Yet these items were constantly referred to by the prosecutor throughout the trial, despite the prosecutor's own knowledge that they meant nothing. [See affidavit of juror and investigator Vargas; also Prosecutor's opening statement, closing argument.]

On the strength of coerced statements, taken without probable cause, and items that were not only taken illegally but ultimately hidden from the

jury because they tended to prove the Petitioner innocent, the jury convicted Mr. Hughes.

They next had to answer the two "Special Issues" under Article 37.071 of the Texas Code of Criminal Procedure. The first such question asked if "…the jury found beyond a reasonable doubt that the conduct of the Defendant which caused the death of the deceased was committed deliberately and with the reasonable expectation that death would result?" The second question asked whether or not "… the jury found beyond a reasonable doubt a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?".

During the punishment phase, the jury heard evidence of a past prior conviction for aggravated assault that was later overturned on appeal. They also heard evidence that supposedly tied the Petitioner to other sexual assaults, and this tied up their prior misdirection nicely. Having heard a confession that was taken improperly, having been told that physical evidence that disagreed with those statements actually helped prove Petitioner's guilt, they now heard improper punishment evidence. This naturally led them to answer those questions presented at punishment with a "Yes". Once answered, the trial court had to impose a sentence of death, and this petition results.

13

## LIST OF THE CLAIMS

1. THE APPLICANT IS ENTITLED TO RELIEF FROM THE COURT BECAUSE HIS CONFESSION WAS COERCED AND INVOLUNTARY IN VIOLATION OF THE APPLICANTS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

2. THE APPLICANT IS ENTITLED TO RELIEF BECAUSE THE PROSECUTOR IMPROPERLY FAILED TO REVEAL EXCULPATORY EVIDENCE UNTIL FORCED TO DO SO AT TRIAL IN VIOLATION OF BRADY V. MARYLAND.

3. THE APPLICANT IS ENTITLED TO RELIEF BECAUSE THE PROSECUTOR EMPHASIZED IMPROPER AND UNADMITTED EVIDENCE BEFORE THE JURY.

4. THE APPLICANT IS ENTITLED TO RELIEF BECAUSE THE EVIDENCE SUPPORTING THE ANSWER TO THE FIRST SPECIAL ISSUE  REGARDING THE DELIBERATENESS OF THE SECOND KILLING WAS LEGALLY INSUFFICIENT

5. THE APPLICANT IS ENTITLED TO RELIEF BECAUSE THE TEXAS DEATH PENALTY STATUTE UNDER V.A.C.C.P. 37.071 VIOLATES THE APPLICANT'S RIGHT TO DUE PROCESS AND FREEDOM FROM CRUEL OR UNUSUAL PUNISHMENT UNDER THE FIFTH, FOURTEENTH, AND EIGHTH AMENDMENTS.

6. THE APPLICANT IS ENTITLED TO RELIEF BECAUSE HIS DEATH SENTENCE WAS OBTAINED IN VIOLATION OF THE APPLICANT'S RIGHT TO EQUAL PROTECTION OF THE LAW UNDER THE FOURTEENTH AMENDMENT.

7. THE APPLICANT IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE BECAUSE IT WAS OBTAINED IN VIOLATION OF THE SUPREMACY CLAUSE WHICH MAKES SIGNED AND RATIFIED TREATIES THE LAW OF THE LAND, AND IN THIS INSTANCE HIS SENTENCE VIOLATES THE CONVENTION AGAINST TORTURE.

355

8. THE APPLICANT IS ENTITLED TO RELIEF AND A STAY FROM HIS DEATH SENTENCE BECAUSE THE STATE WRIT APPLICATION PROCEDURE ITSELF UNDER ART. 11.071 VIOLATES DUE PROCESS AND EQUAL PROTECTION.

9. THE APPLICANT IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE BECAUSE THE TEXAS CLEMENCY PROCEDURES VIOLATE THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.

10. THE APLICANT IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE BECAUSE THE TEXAS CLEMENCY PROCEDURES VIOLATE THE INTERNATIONAL CONVENTION ON HUMAN RIGHTS UNDER ARTICLE SIX AND THUS THE SUPREMACY CLAUSE.

11. THE APPLICANT IS ENTITLED TO RELIEF UNDER INTERNATIONAL LAW AND THE SUPREMACY CLAUSE BECAUSE THE DEATHPENALTY IS APPLIED IN AN ARBITRARY AND UNEQUAL MANNER IN VIOLATION OF THE INTERNATIONAL COVENEANT ON HUMAN RIGHTS.

12. THE APPLICANT IS ENTITLED TO RELIEF FROM THIS COURT BECAUSE THERE IS CONVINCING NEW EVIDENCE REGARDING THE APPLICANT'S LACK OF FUTURE DANGEROUSNESS.

13. OTHER CLAIMS FOR RELIEF

THE APPLICANT EXPRESSLY RESERVES THE RIGHT TO BRING FORTH NEW CLAIMS BASED UPON EVOLVING DECISIONS OF THE SUPREME COURT OF THE UNITED STATES AND THE TEXAS COURT OF CRIMINAL APPEALS AND UPON NEWLY DISCOVERED EVIDENCE. THE ARBITRARY AND UNCONSTITUIONAL TIME LIMITS CONTAINED WITHIN THE ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT PREVENTED THE ASSIGNED COUNSEL FROM FULLY INVESTIGATING ALL POSSIBLE CLAIMS. THE APPLICANT RENEWS THE OBJECTIONS IN THE PREFACE AND AGAIN URGES THIS

COURT TO EXTEND THE TIME FOR FILING THIS APPLICATION.

The Applicant made two statements to the police as a result of custodial interrogation, a statement coerced from him in violation of the Fifth and Sixth Amendments. See *Miranda v. Arizona,* 384 U.S. 435 (1966). The Supreme Court just this term reaffirmed Miranda in the *Dickerson v. United States* decision, No. 99-5525, slip op. June 26, 2000, in which it clearly restated that statements taken in violation of a suspects rights are not admissible. This case involves just such an improperly obtained statement.

The Applicant has clearly stated in the attached affidavit that his statements were not the result of a free and voluntary waiver of his rights. Instead they were the result of threats, intimidation, the fear of having his probation revoked for a relatively minor transgression, and a severe beating at the jail. Under *Miranda,* it is clear that statements that are the result of custodial interrogation which are not given freely, knowingly, and voluntarily are not admissible. The Supreme Court itself noted at 384 U.S. 455 that the nature of custodial interrogation itself is extremely coercive, and "trades on the weakness of individuals."

In *Arizona v. Fulminante,* 499 U.S. 279 (1991), the Supreme Court determined that a confession to a police informant that was based upon a

353

credible threat of physical violence and coercion was inadmissible. It found that "...a defendant's confession is like no other evidence. It is probably the most probative and damaging evidence that can be admitted against him, and if it is a full confession, a jury may be tempted to rely on it alone in reaching its decision. The risk that a coerced confession is unreliable, coupled with the profound impact it has upon the jury, requires a reviewing court to exercise extreme caution before determining that the confession's admission was harmless." *Fulminante*, at 295-296.

The HPD Homicide investigator testified at the Applicant's trial that he freely and voluntarily waived all his rights when brought in for questioning, understood everything, and never asked for an attorney. Yet the statements supposedly given by the Applicant contradict each other, and at no point match up to the physical evidence. In the first statement, Mr. Hughes reportedly claims he thought he was being attacked by a man, and stabbed the girl by accident. There was no mention of the boy, nor was there any attempt to explain his version of a struggle and multiple stab wounds with the truth, i.e. a relatively brief attack in which only a few fatal wounds were inflicted on the girl. This first statement was obtained at five in the morning, without benefit of a magistrate's warnings, from a man who was heavily intoxicated just a few hours before and who had no sleep. Mr.

Hughes has maintained consistently that he was slapped, punched, threatened with being killed and with his probation being revoked if he did not cooperate. [See Affidavit of Preston Hughes, III.]

The second statement makes even less sense, though at least the police tried to cover all their bases this time. The two victims were found ten to fifteen yards apart with no indication that either of them had traveled or moved since they were attacked. In fact it would have been unlikely given the nature of their wounds. So how does one explain the second statement's claim that the boy wandered between the girl and Mr. Hughes? That is clearly not the evidence.

The rest of the forensic evidence also directly contradicted the State's case and the statements forced from Mr. Hughes. In volume IX of the Reporter's Record, the police chemist testified the murder weapon they *thought* they had was found to have no discernible human blood on it, certainly nothing that could be linked to the victims. No blood was found on the Applicant's shoes or on his clothing, a fact Dr. Lloyd White, a noted Medical Examiner from Neuces County found to be unlikely given the nature of the manner of death. [See Opinion letter of Dr. White.]

The semen sample was never even tested until the trial! When it was, it could not be linked to the Applicant! The fact that there even was a semen

351

sample contradicted the second statement, which did not mention any penetration or ejaculation. There was also no facial bruising of the female deceased noted on the autopsy. This again flies in the face of the second statement where Mr. Hughes, per our diligent police investigators, swore he struck the deceased during a squabble over money. Then there is the matter of the glasses, supposedly identified by the deceased's friend. Nowhere in the statements are these eyeglasses mentioned. Nowhere is a reason offered for their sudden appearance at Mr. Hughes' apartment, because logically if the girl wore them or carried them they should have been at the scene. None of the evidence actually matches up to either of the statements obtained by the police. None of the statements are supported by the evidence.  Mr. Hughes has laid out a clear case of intimidation and coercion based on a very credible threat of physical violence. This Honorable Court should hold an evidentiary hearing to review whether or not this statement was coerced, and to contrast and weigh it against the previous matters admitted at trial. Relief should be granted since the Applicant's statement was not given voluntarily, and was instead the product of brutal coercion and threats.

    2.  THE APPLICANT IS ENTITLED TO RELIEF BECAUSE THE   PROSECUTOR   IMPROPERLY   FAILED   TO   REVEAL

EXCULPATORY EVIDENCE UNTIL FORCED TO DO SO AT TRIAL IN VIOLATION OF BRADY V. MARYLAND.

The test to decide whether a prosecutor's conduct is improper is set forth in the Supreme Court opinion *United States v. Young,* 470 U.S. 1, 10 (1985). The elements that must be established include: I) whether the conduct viewed objectively was improper and II) whether the probable impact of that conduct prejudiced the verdict. The rule that is applied to such situations is Rule 52 of the Federal Rules of Criminal Procedure that states: (a) Harmless error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded. (b) Plain error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

A prosecutor's "remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant." *United States v. Young* 470 U.S. 1, 10 (1985).

In *Berger v. United States,* 295 U.S. 78 (1935), the United States prosecuting attorney was found to have far overstepped his bounds by "misstating the facts in his cross examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; *of assuming prejudicial facts not in evidence*; of bullying and arguing with witnesses; and in general, of conducting himself in a thoroughly indecorous manner. (Emphasis added) *Id. at* 82.  In *Berger*, the court emphasized that the prosecution's suggestions and insinuations were likely to carry more weight against the accused when they really shouldn't carry any. *Id*. at 86.

In another leading case, *United States v. Agurs*, 427 U.S. 97 (1976), the defendant was convicted of the stabbing murder of a man by stabbing him with his own knife. The defense argued that the prosecutor's failure to disclose the victim's prior criminal record constituted misconduct, and was therefore, reversible error.  The issues before the court was : I) whether a prosecutor has a duty to disclose exculpatory evidence to the defense absent a formal request; II) whether a defendant is denied his due process right to a