fair trial when exculpatory evidence of a victim's past criminal record is known to the prosecutor and not disclosed to defense counsel without a formal request. The court answered in the negative on both issues. The Supreme Court reversed the lower court's reversal of defendant's murder conviction. *Id.*

*Agurs* leaves us with the general rule that a prosecutor has a constitutional duty to volunteer exculpatory matter to the defense absent a specific request *only* if the evidence is of such substantial value that the accused's due process right to a fair trial would be denied and the outcome of the case would be substantially changed. *Id.* Evidence tending to establish a criminal defendant's innocence is usually not forthcoming from the prosecution in a criminal case. The *Agurs* court applied the test set forth by *Brady v. Maryland*, 373 U.S. 83 (1963).

In *Brady,* the defendant was convicted of murder and sentenced to death. During the trial, Brady admitted to being involved in the murder but stated that his accomplice Boblit was responsible for the actual killing. Brady's defense counsel conceded that Brady was guilty of felony murder in the first degree but requested that the jury return a verdict "without capital punishment." After trial and sentencing, defendant learned that the state had withheld exculpatory evidence in the form of an extra-judicial statement by

Boblit admitting to the murder after the defense had requested examination of such document. *See Brady.*   The Supreme Court *held* that the suppression of the statement by the State violated the defendant's due process rights because the evidence was material to guilt and punishment.   The court decided that regardless of the prosecution's intent (good or bad faith), the defendant was entitled to a new trial regarding sentencing only.

The test set forth in *Brady* as interpreted is: I) the prosecution must first suppress exculpatory evidence II) that impliedly favors the defendant III) who requests production IV) of the material evidence which points to guilt or to punishment V) irrespective of the good faith or bad faith of the prosecution. *Id.* at 89.   In *Brady*, the court extends *Mooney v. Holohan*, 294 U.S. 103, "where the Court ruled on what nondisclosure by a prosecutor violates due process: "It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.   Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." *Id.* at 112.

Under *Thomas v. State,* 841 S.W.2d 399 (Tex.Crim.App. 1992), the court held that the state has an affirmative duty to disclose evidence that is favorable and material to a defendant's guilt or punishment.   If the prosecutor is unsure whether certain evidence must be disclosed he should submit it to the trial court for its consideration.

<u>The Law Applied to the Facts</u>

In the case at bar, the prosecution obtained evidence from the scene.  This evidence included a knife and sheath seized from Preston Hughes' apartment as well as, pants, shirt and a "rape kit" analysis done on Shandra Charles. According to the police report this evidence was taken by the police department and submitted to the Houston Police Department Crime lab. There was other evidence taken from the victims to include blood samples and fingernail scrapings that were taken by the Harris County Medical Examiners Office.  According to the report this evidence was collected for further analysis. The defense filed discovery motions to include request for "Brady" material.

Results of blood test or other types of analysis on any of the evidentiary items were never given to the defense prior to trial. (See, Defense Counsel Affidavit Exhibit __).   The case proceeded on to trial where the prosecution gave an opening statement alleging that the defendant

sexually assaulted Shandra Charles. Throughout the trial the prosecution inplied, through testimony of witnesses as well as his opening and closing argument, that Preston Hughes sexually assaulted Charles. (see R.R. Vol. XVIII, pp. 16 (lines 8,9) and Vol. XXI, pp. 47 -52).

The prosecution did not have physical evidence to back up the assertions that Preston Hughes raped Charles. Although a rape kit was done, the prosecution could only say that there was evidence of semen, but they could not determine the blood type. What was abundantly clear was that the semen could not be matched to Preston Hughes. (See R.R. Vol. XIX, pp. 445-463).   Likewise, the knife and clothes introduced at trial were inconclusive as to blood type. The state's expert testified that trace amounts of blood were found but they could not determine the source. The expert could not even tell the jury if it was human or animal blood on the knife, sheath, and clothes. (R.R. Vol. XIX, pp. 445-463).

The defense eventually figured out that the state did not have blood type evidence in the case. At that point, they requested the state conduct test on the evidence in court. Counsel for the defense was allowed to observe the test. (R.R. vol. XIX, pp. 440-444)  In doing so he forced the state to comply but not before prejudicing his case.

The prosecutor committed misconduct in arguing to the jury that

Preston Hughes raped Ms. Charles in light of the lack of evidence to substantiate such an accusation. His statements in closing argument as well as his assertions throughout the trial, clearly had an impact on a jury and had a prejudicial affect on the defendant. (See Affidavit of Defense Counsel). It is reasonable to conclude if the jury believed the defendant raped the victim, it will have a strong impact on how they conclude the evidence.

The prosecutor intentionally mislead the jury in regard to whether or not Preston Hughes raped Ms. Charles because he realized that that inference coupled with punishment evidence of a sexual assault would most likely result in the death penalty the state was seeking. Simply stated, the prosecutor knew that an assertion during guilt/innocence that Preston Hughes raped Ms. Charles would become a powerful assertion during punishment when heard with other sexual assault evidence. The prosecutor turned a "blind eye" to the fact that there was no physical evidence implicating Hughes, and argued that Hughes raped her without proof. He argued that Hughes raped her for the sole purpose of prejudicing the jury when they heard punishment evidence.

The fact that none of the physical evidence could be linked to Preston Hughes through scientific evidence is "Brady" material. "Brady" is anything that tends to exculpate the accused. See *U.S. v. Brady,* 373 U.S., 83

(1963). In this particular case, the fact that the semen on the victim did not test as a match to Preston Hughes directly conflicts with the state's theory of the case and argument.

It is reasonable to believe that had the evidence tested positive as to Preston Hughes, or the victims in the case of the knife and sheath, the state would have certainly argued that point. The state on the other hand, knew that there was not a match or correlation they could exploit, but they failed to inform the defense. But what are even more egregious is that in light of the lack of foundation, they argued and inferred that Hughes raped the victim and that the knife from the apartment was the murder weapon.

Had the defense known that the state could not make a correlation between the rape kit evidence with Preston Hughes, and the knife and sheath with the victims- a more effective trial strategy could have been developed. That is, they would have argued motions in limine preventing the state from making assertions they could not prove. They might have even been able to exclude evidence the evidence on the basis that it was highly prejudicial and of very little probative value. (See Ellis McCullough Affidavit)

The combination of the prosecution's actions in withholding exculpatory evidence that there is no correlation between semen on the victim and the defendant, and then arguing that he raped the victim is

inconsistent with the rudimentary demands of justice.  Likewise withholding evidence of blood on the knife and sheath coupled with the inability to correlate it to the victim, and then arguing and inferring that it is the murder weapon is also inconsistent with the demands of justice.

The prosecutor did not stop there.  It was on the eve of trial when they finally informed  defense counsel of the presence of blood on the knife and clothes of the defendant.  (R.R. vol. XIX, 439-444)  And the defense did not learn until the middle of trial that the state's witness could not testify to any specifics of the blood, for example, whether or not the blood was human. Once again this affected the defense's trial preparation and examination of witnesses.   The prosecution "sand bagged" the defense by withholding the exculpatory evidence until the last minute so that they could make arguments and inferences without being challenged by the defense.  By the time the defense forced the state to conduct the test and reveal the exculpatory information, the state had already "poisoned the jury."

The Applicant is entitled relief based on the prosecutor's misconduct in this case.  The prosecution should have turned over the exculpatory information in a reasonable time, thereby giving the defense an opportunity to either limit or omit the states arguments and inferences regarding the evidence.   The prosecution committed further misconduct by arguing

inferences and facts that could not be proven from the evidence. The defense was prejudiced significantly by the prosecution's acts. The inferences and arguments of the prosecution regarding rape were important for the state because it increased their chances of securing a death sentence for Mr. Hughes.

The fundamental ends of justice demand relief in this case.

### 3. THE APPLICANT IS ENTITLED TO RELIEF BECAUSE THE EVIDENCE SUPPORTING THE ANSWER TO THE FIRST SPECIAL ISSUE REGARDING THE DELIBERATENESS OF THE SECOND KILLING WAS LEGALLY INSUFFICIENT

A federal court must consider not whether there was any evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of fact to find guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358 (1970).

*In re Winship* presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense. After *In re Winship*, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was

properly instructed on reasonable doubt, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. The relevant question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The Thompson "no evidence" rule is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt.

In a challenge to a state conviction brought under 28 U. S. C. [s] 2254, which requires a federal court to entertain a state prisoner's claim that he is being held in "custody in violation of the Constitution or laws or treaties of the United States," the applicant is entitled to relief if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  A federal court has a duty to assess the historic facts when it is called upon to apply a constitutional standard to a conviction obtained in a state court. For example, on direct review of a state-court conviction, where the claim is made that an involuntary confession was used against the defendant, this Court reviews the facts to determine whether the confession was wrongly admitted in evidence. *Blackburn v. Alabama*, 361 U.S. 199, 205-210 (1960). Cf. *Drope v. Missouri*,420 U.S. 162, 174-175, and n. 10 (1975). The same duty obtains

30

in federal proceedings. *See Townsend v. Sain*, 372 U.S. 293, 318 (1963); *Brown v. Allen*, 334 U.S. 443, 506-507 (1953) (opinion of Frankfurter, J.).

Under 28 U. S. C. § 2254, a federal court must entertain a claim by a state prisoner that he or she is being held in "custody in violation of the Constitution or laws or treaties of the United States." Under the *Winship* decision, it is clear that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim. Thus, assuming that state remedies have been exhausted, see 28 U. S. C. § 2254 (b), and that no independent and adequate state ground stands as a bar, *see Estelle v. Williams*, 425 U.S. 501 (1976); *Francis v. Henderson*, 425 U.S. 536 (1976); *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Fay v. Noia*, 372 U.S. 391, 438 (1963), it follows that such a claim is cognizable in a federal proceeding.

In reviewing a claim of insufficiency, we examine all the evidence in the light most favorable to the verdict and ask whether any rational trier of fact could have found the issue in controversy to have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 317, 61 L.Ed.2d 560, 99 S.Ct. 2781 (1979). Where a state appellate court has conducted a thoughtful review of the evidence, moreover, its determination is entitled to

338

great deference. *Parker v. Procunier*, 763 F.2d 665, 666 (5th Cir.), cert.
denied, 474 U.S. 855, 106 S. Ct. 159, 88 L. Ed. 2d 132 (1985).

The term "deliberately" need not be defined in the jury charge, but
rather jurors should be left to give the term its common usage. *Cordova v.
State*, 698 S.W.2d 107 (Tex.Cr.App. 1985); *Cannon v. State*, 691 S.W.2d
664 (Tex.Cr.App. 1985); *Stewart v. State*, 686 S.W.2d 118 (Tex.Cr.App.
1984); *Morin v. State*, 682 S.W.2d 265 (Tex.Cr.App. 1983); *Russell v. State*,
665 S.W.2d 771 (Tex.Cr.App. 1983); *Hawkins v. State*, 660 S.W.2d 65
(Tex.Cr.App. 1983); *King v. State*, 553 S.W.2d 105 (Tex.Cr.App. 1977). The
term "deliberately," as used in the first special issue is not the linguistic
equivalent of "intentionally," as used in the charge on guilt-innocence.
*Stewart v. State*, supra; *Fearance v. State*, 620 S.W.2d 577 (Tex.Cr.App.
1981) (Opinion on Rehearing); *Heckert v. State*, 612 S.W.2d 549
(Tex.Cr.App. 1981). In *Fearance*, the court defined "deliberately" as the
"thought process which embraces more than a will to engage in conduct and
activates the intentional conduct" but noted that conduct committed
"deliberately" need not be premeditated. 620 S.W.2d at 584. See also
*Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App. 1976). In *Cannon v. State*,
supra, the court stated that to find the act of deliberateness, there must be
"the moment of deliberation and the determination on the part of the actor to

kill." 691 S.W.2d at 677.

If, as *King*, supra, instructs, we are to take the common meaning of a simple word in its ordinary usage, any handy dictionary will confirm that "deliberately" means just that - a manner of doing an act that is "characterized by or resulting from careful and thorough consideration," "characterized by awareness of the consequences; willful," "slow, unhurried, and steady as though allowing time for a decision." Webster's New Collegiate Dictionary, G. & C. Merriam Co. (1977). (ENDNOTE 10) That definition has not varied from the one approved by the Court more than eighty years ago in *Ferguson v. State*, 36 Tex. Crim. 60, 35 S.W. 369, 370 (Tex.Cr.App. 1896): "Deliberately' means 'with careful consideration or deliberation; with full intent; not hastily or carelessly, -- as a deliberately formed purpose." This definition was in turn reiterated with approval sixty five years ago in *Welch v. State*, 71 Tex.Crim. 17, 157 S.W. 946 (Tex.Cr.App. 1913, 584 and 584 n. 6 (Tex.Cr.App. 1981) (Opinion on appellant's motion for rehearing), the court characterized "deliberately" as "the thought process which embraces more than a will to engage in conduct and activates the intentional conduct," and described "the person who engages in certain conduct deliberately" as one who "has upon consideration said to himself, 'Let's do it."

## Law Applied to the Facts

In the case at bar, the evidence is not sufficient to support a finding that Preston Hughes' actions were deliberate as to the killing of the second victim, Marcell Taylor.   Preston Hughes gave several statements to the Houston Police Department investigators.   These statements were admitted in evidence over the objection of counsel for Hughes and after a pretrial hearing in which their admissibility was challenged.   In his initial statement to the police (according to police records) he denied knowledge of the first victim, Shandra Charles, but eventually broke down and stated that he had stabbed her mistakenly.   According to the police report, Hughes stated that he had received death threats from the brothers and husband of a woman he was seeing.   He then began carrying a knife for about two weeks.   He was walking along the trail between the Fuddruckers restaurant and his apartment when he was taped on the shoulder.   He pulled his knife and started to stab the person.   He then stated that it was "Shawn" (nickname for Shandra Charles).   He stated that he panicked and ran to his apartment. There was no mention of the second victim in his first interview with police. (see Police Report exhibit, Defendant's statements).

Officers then approached Hughes for a second statement several hours

34

later because he did not mention the second victim (Marcell Taylor) in his first interview.  Again, according to the police report, Preston Hughes stated in the second interview that he was walking from the Fuddruckers when he met Shawn on the trail.  She first asked Hughes if she could borrow contacts, and Hughes refused.  She then made sexual advances towards him and asked to borrow fifty dollars.  According to police, Hughes stated that Shawn then said she was going to call the police and report him for rape and then she hit him.  The police allege that Hughes then said he pulled his knife and stabbed her several times.  According to his statement the little boy began crying and walked in between them and he stabbed the little boy.  (See Police Report, Hughes statement).

Based on the statements attributed to Preston Hughes in the police report and in his written statements, he did not deliberately stab the second victim Marcell Taylor.  For the act to be deliberate, it requires "the thought process which embraces more than a will to engage in conduct and activates the intentional conduct." *Fearance v. State*, 620 S.W.2d 577 (1981).  When one considers the statement of Hughes regarding the stabbing of the child it is devoid of "deliberateness."  The second victim moved between he and his intended victim Ms. Charles.  In doing so he was struck with the knife and killed.  The required consideration and deliberation to engage in the conduct

35

is not present in this case with regard to the second victim.

Because the deliberate element does not exist with regard to the second victim the applicant is entitled to habeas relief. The state's theory of the case was "double homicide" thereby requiring deliberateness in both deaths. Since the second death was not deliberate the applicant is entitled relief.

4. THE APPLICANT SHOULD BE GRANTED RELIEF FROM HIS DEATH SENTENCE BECAUSE THE JURY CONSIDERED AT PUNISHMENT A PAST CONVICTION WHICH WAS LATER OVERTURNED ON APPEAL IN VIOLATION OF THE EIGHTH AMENDMENT.

At trial, the Applicant was shown to be on a form of community supervision called "deferred adjudication" as a result of a plea in Cause 446,873 for the offense of aggravated assault. [State's Exhibits 47, 51] See also testimony of Tracy Heggar, at Volume XXII, 16-50. This offense was later reversed and the plea set aside as fundamentally defective in *Hughes v. State*, 833 S.W.2d 137 (Tex. Crim. App. 1992). Thus the jury heard about an offense which was later reversed, and considered it in answering the question on future dangerousness. This was not harmless error, and directly contributed to the juror's decision on this question.

In the above named cause, Mr. Hughes was alleged to have retaliated against a complainant, Ms. Heggar, by threatening to harm her if she testified against him in an aggravated sexual assault case in 1986. When she turned to run, he supposedly pulled out a gun and fired at her. Mr. Hughes adamantly denies such a shooting ever took place, but as the prosecution was allowed to go into this offense, and exploited it heavily on final punishment argument, [Vol. XXIII, 162-170]. In fact the Court of Criminal Appeals itself recognized that this was wrong in its decision on this case in direct review, but decided under the error was harmless.

Nothing could be further from the truth. In deciding whether or not an individual is likely to commit continuing acts of criminal violence that would constitute a continuing threat to society, nothing could be more relevant to a jury's decision than an alleged act of gun-play to intimidate a witness. Such an admission before any rational jury is harmful, and no amount of wishful thinking on the part of the state court will change that. The Supreme Court itself held in *Johnson v. Mississippi,* 486 U.S. 578 (1988) that when Johnson's convictions for a felony in New York was reversed a death sentence based in part on such a conviction could not stand. Quoting the decision in *Gardner v. Florida,* 430 U.S. 349, 359 (1977) the Court held that the possibility that a jury believed that a petitioner had been

37

convicted of a prior felony could be decisive in their decision between life and death, and of course was prejudicial. Here, Ms. Heggar testified that Mr. Hughes had been convicted of raping her and shooting a gun at her. [RR. XXIII, 29] The prosecutor emphasized that heavily in his closing argument at punishment. [RR XXIII-170] How could any jury fail to heed such evidence of future dangerousness? In fact, per the affidavit of the trial attorney, and in discussions with one of the jurors, it is clear that they did consider such evidence when making their decision on life or death on Question # 2. [See affidavit of Ellis McCullough and Investigator Vargas] Such a constitutionally infirm proceeding and sentence, based upon impermissible evidence, must not be allowed to stand. See also *Burgett v. Texas*, 389 U.S. 109, 115 (1967); *Zant v. Stephens*, 462 U.S. 862 (1983). This Honorable Court should grant relief on this ground, vacate the Applicant's death sentence, and order him released pending another sentencing hearing.

5. THE APPLICANT IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE AS THE PROSECUTOR VIOLATED HIS RIGHTS UNDER THE SIXTH, EIGHT, AND FOURTEENTH AMENDMENTS BY ARGUING AT PUNISHMENT THAT THE DEFENSE COUNSEL WAS SOMEHOW WRONG TO ASK THE STATE'S WITNESS QUESTIONS.

During the final arguments on punishment the prosecutor, who had already been admonished regarding improper questions, made extraordinarily improper jury argument.   [RR. XXIII-170] He stated the following:

PROSECUTOR: I suggest to you that the testimony of Tracy Heggar alone is enough to put the needle in this man's arm. And for that little girl to be brought down here and for Mr. McCullough and Mr. Thomas to put her on trial again is not right.

DEFENSE COUNSEL: Objection. He put her on the stand, Your Honor. I object to him raising the issue that we've done something wrong by protecting our client's rights, by asking a few simple questions of the witness he put on the stand. I object to it.

PROSECUTOR: I apologize. I don't want to insinuate---

DEFENSE COUNSEL: I don't want his apology.

PROSECUTOR: I'm not saying that Mr. McCullough or Mr. Thomas has done anything wrong.

DEFENSE COUNSEL: I object, Mr. Prosecutor. I have made an objection.

THE COURT: That objection will be overruled.

PROSECUTOR: They have done nothing wrong.  They're trying to protect their client. It's their job. It doesn't mean it's the right thing to do.

DEFENSE COUNSEL: I object to him striking at my client over the shoulders of counsel by accusing us of doing something that ain't the right thing to do, which was clearly within the rules, would have been malpractice if we hadn't done it. I request that they jury be instructed to disregard counsel's remarks.

COURT: That objection will be sustained. Jury will disregard the last remark of the prosecutor and not consider it for any purpose whatsoever.

DEFENSE COUNSEL: I would move for further relief, Your Honor.

COURT: That will be denied.

These comments went so far beyond the bounds of permissible argument that their prejudice is clear. To insinuate that it was somehow the defense counsel's [and thus the defendant's] fault that the State's witness had to undergo cross was beyond the pale. It was carefully designed to inflame the jury and to make them angry at the Petitioner, and it was done over the shoulders of defense counsel who were doing their normal job.

When a defendant's right to put on a defense is attacked, the process suffers, and his Sixth Amendment rights are challenged. When a defendant's ability to seek a life sentence is undermined, then his rights under the Fourteenth and Eighth amendments are badly damaged, and his sentence should not stand as it is likely based upon prejudice and emotion. In

*Caldwell v. Mississippi,* 472 U.S. 320 (1985) the Supreme Court held that it was not permissible for a prosecutor to argue that responsibility for imposing death could be shifted from a jury.  See also *Baldwin v. Alabama,* 472 U.S. 372, 382 (1986) where the Court stated that " a death sentence based upon consideration of factors that are constitutionally impermissible or totally irrelevant to the sentencing process..." would violate the Constitution.  This argument was manifestly designed to inflame the jurors and attack the Petitioner over his counsel's shoulders.  It cannot be certain that it had no effect on the deliberations of the jurors, and so this death sentence should be vacated and relief granted.

6. THE APPLICANT IS ENTITLED TO RELIEF BECAUSE THE TEXAS DEATH PENALTY STATUTE UNDER V.A.C.C.P. 37.071 VIOLATES THE APPLICANT'S RIGHT TO DUE PROCESS AND FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT UNDER THE FIFTH, FOURTEENTH, AND EIGHTH AMENDMENTS AS IT PROVIDES NO GUIDANCE AS TO MITIGATION WHATSOEVER.

The Applicant was sentenced under the provisions of Article 37.071 of the Texas Code of Criminal Procedure.  This portion of the Code requires that sentencing jury must provide answers to two "Special Issues". [See attached copy of exact wording of Special Issues] The first

asks whether the person, in essence, committed the killings deliberately. The second question asks the jury to peer into the future and guess whether the Defendant is likely to commit future acts of criminal violence that would constitute a danger to society, and is commonly referred as the "Future Dangerousness" question.   There was not any opportunity for the jury in this case to consider or give effect to any mitigating evidence that the Defendant might offer.

Ironically, the mitigation question was forced upon Texas by the Supreme Court in the Penry case.   *Penry v. Lynaugh*,   492 U.S. 302 (1989) in order to force Texas juries to give meaningful effect to any factor which may have made the Defendant less morally blameworthy. Prior to this question, there was no way for any Texas jury to give that desire to offer mercy any effect.

This flies in the face of the Supreme Court's prohibitions in death penalty jurisprudence regarding results that are "freakish" or wanton, or that fail to give the jury a vehicle for imposing mercy, or to provide meaningful appellate review.

In 1972 Supreme Court Justice Brennan wrote on the unfair application of the death penalty:

42

"When a country of over 200 million people inflicts an
unusually severe punishment no more than 50 times a year, the
inference is strong that the punishment is not being regularly
and fairly applied. To dispel it would indeed require a clear
showing of non-arbitrary infliction. . . . When the punishment
of death is inflicted in a trivial number of the cases in which it
is legally available, the conclusion is virtually inescapable that
it is being inflicted arbitrarily. Indeed, it smacks of little more
than a lottery system." *Furman v. Georgia*, 408 U.S. 238, 293
(1972) (Justice Brennan concurring)

Twenty years later, Supreme Court Justice Blackmun addressed the same
subject:

"I am ... optimistic that this Court eventually will conclude that
the effort to eliminate arbitrariness ... is so plainly doomed to
failure that it -- and the death penalty -- must be abandoned
altogether. I may not live to see that day, but I have faith that
eventually it will arrive."

In order to remove the possibility that a jury might impose the
ultimate penalty arbitrarily, the Supreme Court, in a series of decisions,
found that jury must be able to express a reasoned moral choice. The jury

43

should only impose the death sentence when it had conducted an individualized determination of the defendant's life as a whole.  See *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978).  In this case, there was no way under those questions to do so.

To the credit of the defense team, they tried. They obtained and put forward a handwritten mitigation instruction from the trial court judge that was in essence a "nullification" instruction.  It told the jurors that if they should find any mitigating factor they should answer the actual questions with a "No". [See Clerk's record, Mitigation Instruction].  However, a nullification instruction cannot be relied upon to ensure that such a harsh sentence is imposed with any degree of reliability.

Nullification itself has never been an accepted part of our law.  See *Roberts v. Louisiana,* 428 U.S. 325 (1976), which found constitutional problems with a statute which encouraged jurors to violate their oath to uphold the law.

Thus the statute itself is structurally unsound, and even if the jurors had wanted to give informed expression to the testimony from Preston Hughes family and friends about his kind behavior towards them, there was no vehicle to permit such expression. Mr. Hughes should be granted relief

from his death sentence as the very statute he was tried under structurally

violated the Eighth and Fourteenth Amendments.

7. THE APPLICANT IS ENTITLED TO RELIEF BECAUSE HIS
DEATH SENTENCE WAS OBTAINED IN VIOLATION OF THE
APPLICANT'S RIGHT TO EQUAL PROTECTION OF THE LAW
UNDER THE FOURTEENTH AMENDMENT.

The Applicant is an African American male. Racism continues to play

an unacceptable and powerful role in capital punishment. In state death

penalty cases, the race of the victim is much more important than the prior

criminal record of the defendent or the actual circumstances of the crime.

More than half of those on death row are people of color, although they

represent only 20% of the people of the U.S. Although they are about 6% of

the U.S. population, about 40% of those on death row are African American

men. A 1984 death penalty case, *McCleskey v. Kemp*, 481 U.S. 279 (1987),

showed that in Georgia those whose victim is white are four times more

likely to be sentenced to death than those who kill a black person. At the

federal level, African American and Hispanic defendants are

disproportionately selected for capital prosecution. Since 1988, the federal

government has sought the death penalty in 92 cases. Of these, 56

defendants (61%) were black, 11 were Hispanic, 5 were Asian, and 20 were

Caucasian. Several studies have shown the role of race in the death penalty.

They include a 1990 report by the U.S. General Accounting Office report to the Senate and House Committees on the Judiciary, entitled, "Death Penalty Sentencing: Research Indicates a Pattern of Racial Disparities".

In Texas, where the decision to seek the death penalty rests with the prosecution, there was not, at last election statewide, a single elected African-American District Attorney in the state to the Applicant's knowledge. In Harris County, out of twenty-two felony criminal courts, only one has an African American judge on the bench, in a county where approximately 18% of the population is African American. Harris County itself places a much higher number of African-American defendants on death row than the representation in the general population. See HOUSTON CHRONICLE, SERIES "Deadly Distinction", 2-4-01 to 2-7-01, noting significantly higher rates of blacks placed on death row from Harris County. See also "A State of Denial" a study by the Texas Defender Services, noting the significantly higher chances in Texas of being placed on death row for blacks, particularly those with white victims. [Relevant chapters attached]

Although the statistical basis for the allegations of racial disparity here are clear, *McCleskey* made it clear that a showing of intent must be made as to discriminatory practice. However, the recent case of *Gore v. Bush*, 531 U.S. ___ (2000), provides a more broad interpretation of what equal

protection truly means.  In that famous voting rights case the Supreme Court found an equal protection violation when the State of Florida treated different voters in different part of the state differently.  To quote the per curiam decision "Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote more than that of another." Slip op., Sec II B.  If one simply substitute's "life" for "vote', one can see that the definition of equal protection has now changed for the benefit of the individual.  Whatever standard this Honorable Court should wish to apply here, however, there must be an evidentiary procedure or hearing regarding whether or not impermissible racially based factors were brought upon individuals involved in investigating, arresting and prosecuting this case.  While the Applicant believes that this claim must be explored via whatever method the Court believes most appropriate, the Applicant respectfully suggests that a method similar to a *Batson* challenge be offered as a basis for making such a claim.  If the Court believes that the Applicant has passed a preliminary threshold of racial disparity, it should then direct that those involved in the process of the case state on the record that there was no racial basis for the perceived disparity, and that a race-neutral reason be offered.   This would appear to be the most expeditious

method and one that would permit the Court to make a credibility determination as well.  The Applicant respectfully requests an evidentiary procedure be granted to explore this factual issue in order to determine intent under *McCleskey v. Kemp,* and asks this Honorable Court for discovery under Habeas Rule 4 in order to explore this issue.   Further the Applicant believes that such exercise is mandated now under the expanded equal protection definition of *Bush v. Gore,* 531 U.S.____ (2000).


8. THE APPLICANT IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE BECAUSE IT WAS OBTAINED IN VIOLATION OF THE SUPREMACY CLAUSE WHICH MAKES SIGNED AND RATIFIED TREATIES THE LAW OF THE LAND, AND IN THIS INSTANCE HIS SENTENCE VIOLATES INTERNATIONAL LAW.

International treaty law is binding federal law that trumps contrary state law. Article VI, clause 2, the Supremacy Clause of the U.S. Constitution, provides, in relevant part:

> [A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the judges of every State shall be bound thereby, any Thing in the Constitution or Laws of the State to the contrary notwithstanding.

One leading treatise on constitutional law concludes that "unless treaties are contrary to the Constitution, they are equal in status to congressional legislation, and, as expressly provided in the text of the Constitution, the supreme law of the land." Nowak and Rotunda,

<u>Constitutional Law</u> 217 (5th ed. 1995).  It is clear, as a matter of international law, that federally organized countries have the obligation to ensure compliance with international human rights law at all levels of government: federal, state and local.  This principle is embodied in the Supremacy Clause.  The U.S. has now ratified a number of human rights treaties which are now effectively federal law, and binding on the states.  See *U.S. v. Benitez*, 28 F. Supp. 2d (S.D. Fl. 1998).

These treaties include: [ratification dates and number of ratifying countries are shown following titles]

**The International Covenant on Civil and Political Rights** (ICCPR), June 8, 1992, 144 countries.

**The International Convention on the Elimination of All Forms of Racial Discrimination** (the Race Convention), October 21, 1994, 155 countries.

**The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment** (the Torture Convention), October 21, 1994, 117 countries.

**The American Declaration on the Rights and Duties of Man** (American Declaration), adopted by the Organization of American States in 1948.

**The Universal Declaration on Human Rights** (Universal Declaration) adopted by the UN on December 10, 1948.

[Various excerpts and sections of these treaties are attached as exhibits to this brief.]

The Universal Declaration is the oldest global instrument on human rights, having been endorsed by all the members of the United Nations shortly after its creation.  The Universal Declaration is widely recognized as embodying principles of international law which are binding on all countries.  See Prof. Hurst Hannum, *The Status of the Universal Declaration of Human Rights in National and International Law*, 25 Ga. J. Int'l & Comp. L. 287 (1995-1996).

The American Declaration has been interpreted to express human rights obligations binding on all countries of the Americas in Advisory Opinion Number 10 of the Inter-American Court of Human Rights. *Interpretation of the American Declaration of the Rights and Duties of Man Within the Framework of Article 64 of the American Convention on Human Rights*, Advisory Opinion OC-10/89 of July 14, 1989, Inter-Am. Ct.H.R. (Ser. A) No. 10 (1989).  The obligatory nature of these norms has also been found in several decisions of the Inter-American Commission on Human Rights challenging the United States on the application of the death penalty.

50

*Celestine v. United States*, Resolution No. 23/89 (1990); *Roach and Pinkerton v. United States*, Resolution No. 3/87 (1987); *Andrews v. United States*, Report No. 57/96, Case 11.139, decided Feb. 19, 1998.  All of these decisions are available on the official Web site of the Commission, or American University's Database of the Commission's decisions.  Advisory Opinion OC-10/89 is available on the official site of the Court, also listed.  See <u>Third Restatement of the Law of Foreign Relations of the United States</u> which recognizes this as well: "Matters arising under customary law also arise under 'the laws of the United States,' since international law is 'part of our law' . . . and is federal law." § 111, reporter's note 4 (1987).[1]  See also, Jordan J. Paust, *Customary International Law and Human Rights Treaties Are Law of the United States*, 20 Mich. J. Int'l L. 301 (1999).

Customary international law is evidenced by "a general practice accepted as law," according to the Statute of the International Court of Justice, Article 38(1)(b).  Another articulation of the sources of customary law is "the general usage and practice of nations," judicial decisions recognizing and enforcing that law, and the "works of jurists." *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160-61 (1820).  "Where there is no treaty, and no controlling executive or legislative act or judicial decision, resort

---

must be had to customs and usages of civilized nations." *The Paquete Habana*, 175 U.S. 677, 700 (1900).   *Paquete* goes on to say that international law, including customary international law "is part of our law, and must be ascertained and administered by the courts of justice."

All of these treaties and customary law decisions make it clear that such items are in fact part of federal law under the Supremacy Clause, and their provisions have the same force as any other federal statute.  The Supreme Court itself has before it a case involving the application of the provisions of these treaties and norms about the execution of juveniles in the cert petition of *Domingues v. Nevada*, No. 98-8327, Orders in Pending Cases, 67 U.S.L.W. 3747 (June 8, 1999).

What is key about these provisions of treaty and customary international law to the case for the Applicant?  The provisions of Article 6 and 7 of the ICCPR regarding the right to life and to be free from torture, the covenants against torture, and the Universal Declaration of Human Rights, all make it clear that the use of capital punishment, must be either *outrightly banned or comply with the extensive procedures used under the provisions of the treaties*.  No other Western country permits the use of the death penalty any longer, nor does Mexico, most of the Caribbean or Latin America, nor Russia.  Certainly as custom and international norms go, this

conviction and death sentence must not stand.  However, even under the specific treaties, this sentence is infirm. It did not provide for competent counsel at all stages or for meaningful clemency or pardon procedures. [This last will also be addressed in a subsequent claim] *It does not provide for immediate judicial review or set aside by the trial court,* and it imposes a lengthy and incredibly tortuous period of brutal and degrading treatment of the Applicant while his appeals process winds through.

This Honorable Court should hold an evidentiary hearing at which it may review the relevant treaties and customs which impact this procedure, seek advisory and expert legal opinion, and make conclusions of law for the Court of Appeals to review.  It should also make findings of fact based upon the norms and procedures used in other countries and the impact of federal treaty law on state procedures. It should provide a recommendation to the Court of Appeals as to whether the current Texas scheme complies with the treaty provisions and international legal norms applicable under the Supremacy Clause.  The Applicant should be granted relief on this issue.

9. THE APPLICANT IS ENTITLED TO RELIEF AND A STAY FROM HIS DEATH SENTENCE BECAUSE THE WRIT APPLICATION PROCEDURE ITSELF UNDER ART. 11.071 VIOLATES DUE PROCESS AND EQUAL PROTECTION.

The provisions of Article 11.071, unlike those of the sister statute, 11.07, actually shorten the time to file and seek review of a death sentence while keeping an indefinite option open for those who received a lesser sentence.  This cannot stand review under the Supreme Court's guidance that liberty and life interests must be protected.   Even as interpreted in the afore-cited case of *Bush v. Gore*, 531 U.S. ___ (2000), a person's equal protection guarantees against loss of voting rights would not stand a statute where one class of people were given a limited right and others were less curtailed. Does not a person's due process interest and equal protection claims against wrongful imprisonment or execution deserve equal weight as their right to vote?

The time limits under 11.071, the capital statute, set up a normal time limit of 180 days from date of appointment of counsel, or 45 days after the filing of the Appellee's brief on direct appeal.  This procedural problem alone requires addressing, since it creates the absurd situation of filling a collateral attack while the direct appeal is still pending, turning several hundred years of habeas law on its head.  It also means that the

315

possibility of addressing the potential ineffective assistance of appellate counsel is removed for several key areas. Such vital appellate functions as reply briefs, oral argument, supplemental letters of new authority, failure to advise the client of his right to seek pro se a Petition for Writ of Certiorari to the Supreme Court, all would be waived for review by the death applicant, but not the applicant under Article 11.07. Likewise a failure to comply with orders to re-brief or to file supplemental briefs, or to supplement the record, all are lost on review to the death applicant due to these ridiculous time limitations.

This additionally creates potentially absurd yet constitutionally critical situations. For instance, in this case, what if the direct appeal was successful on the issue of punishment, and a new trial was ordered for sentencing? If the application for writ is already on file, does that mean it is procedurally exhausted if the Applicant should receive a new death sentence? Or should the reviewing court determine that it can still consider the original guilt/innocence issues while the new sentencing takes place?

The most glaring flaw in this entire procedure, however, is the fact that one class of individuals who face a loss of liberty maintain the right to seek state court review of their case indefinitely. While those who

stand to lose their life have a ridiculously finite amount of time to investigate and file claims. This is clearly unfair and deprives one group of due process and equal protection. This statute is so deeply flawed that it must be declared unconstitutional and a stay of execution granted for the Applicant to file a subsequent state petition.

As persuasive example, the Florida Supreme Court, another jurisdiction with extensive death penalty and habeas experience, recently declared that the Death Penalty Reform Act passed by its legislature was unconstitutional. There, a bill remarkably similar to the provisions of Article 11.071 was found to violate the separation of powers under Florida's constitution, and to expressly go against the prohibitions against suspension of the writ. [Those prohibitions are actually weaker in the Florida Constitution, Art. I., Sec. 13, than in the Texas Article I provisions.] In *Allen v. Butterworth*, a slip opinion recently issued by the Florida Court, it convincingly reviewed the history of the writ in both state and federal courts, and the traditional constitutional jurisprudence regarding its nature. It then concluded that the proposed Reform Act could not pass muster.

The Applicant believes that the provisions under Article 11.071 violate the due process minimums required under *Furman v. Georgia,*

56

313

408 U.S. 238 (1972), and *Gregg v. Georgia,* 428 U.S. 153 (1976) and also the equal protection provisions outlined under the Fourteenth Amendment. Though the Florida court threw out their companion act for different reasons, their review of the applicable doctrine is instructive. This Court should consider whether a state may unfairly deprive its citizens of the protection of the Great Writ when they most need it, i.e. when they are facing death. This Honorable Court should review whether or not this statute adequately protects the constitutional rights of the Applicant. The court should hold hearings so that expert legal opinion may be consulted and reviewed, statistical and anecdotal evidence may be reviewed of the potential problems with the procedural loss of fundamental protections. The Applicant should be granted relief on this issue from his death sentence until such time as an adequate state remedy may be crafted.

10. THE APPLICANT IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE BECAUSE THE TEXAS CLEMENCY PROCEDURES VIOLATE THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.

In Texas, the Board of Pardons and Paroles, an 18-member panel of political appointees, judges all clemency applications. By law, they must recommend to the Governor what may be done, as he has only the power to

57

grant a one-time stay of 30 days without their agreement. As the Board members are appointed by the Governor, this is a convenient way to dodge responsibility for exercising mercy. In the course of the recent administration only one death penalty clemency application has been granted, for Henry Lee Lucas, a man who was clearly not responsible for the crime for which he was to receive lethal injection, but who had other sentences of death in place as "insurance". The Governor also granted one 30-day stay for DNA testing, which ultimately did not lead to any further grants of clemency. To the Applicant's knowledge, not one application for clemency has been granted for an African American male under sentence of death. Over one hundred individuals were executed during the Bush administration. [The former Governor did pardon one person who was cleared of a sexual assault charge by DNA evidence.]

A large body of research records the persistence of racial disparities in the administration of the death penalty in the United States. Data from murder cases in Florida, Georgia, Texas, and Ohio showed that an African-American defendant was about 3 times more likely than a white defendant to be sentenced to death. However, the race-of-victim effects were even more startling: those who kill whites are much more likely to be sentenced to death than those who kill blacks. In Florida, black killers of a white victim

58

were 37 times more likely to be sentenced to death than blacks whose victim was black. In Georgia this factor was 33, in Texas, 87, and in Ohio, 15. The corresponding ratios in the case of white murderers were about 2 in Georgia and in Texas; data for Florida and Ohio were not sufficient to provide meaningful comparisons.   See, S. Gross and R. Mauro, <u>Death and Discrimination: Racial Disparities in Capital Sentencing</u> (1989), p. 55 ff. . See also <u>The Death Penalty in Black & White. New studies on Racism in Capital Punishment</u>. Death Penalty Information Center, Washington, D.C. June 1998; U.S. General Accounting Office, Death Penalty Sentencing, February 1990; Death Penalty Information Center 5/13/99; . David C. Baldus, George Woodworth, and Charles A. Pulaski, Jr., <u>Reflections on the "Inevitability" of Racial Discrimination in Capital Sentencing and the "Impossibility" of Its Prevention, Detection, and Correction</u>, 51 Wash. & Lee L. Rev. 359, 418 (1994).

When one views the amazing disparity in number of applications and those granted, and compares the pardon figures of minorities on death row and minorities who kill whites, one can see that odds of Mr. Hughes receiving a fair review of his clemency application are roughly equivalent to the odds of him flying the space shuttle.  A scheme that has no prohibitions against considerations such as the race or the background of the victim or the

petitioner is one fraught with potential abuse. Texas has such a scheme. A

copy of the rules for clemency and commutation applications is attached to

this brief, and the Petitioner respectfully points out that nowhere even on

their face does any prohibition against the race of either the applicant or the

victim exist. This Court should hold hearings and take evidence from the

Board members who can explain the process and reveal what procedures and

considerations are taking place.  Where there is no chance for clemency

there is no chance for fairness, and the Applicant has a right to expect he

will be treated with minimal safeguards to ensure his protections under law

are not violated.  The Applicant should be granted relief on this issue and

granted a stay of his death sentence until this Court is assured there are

reasonable safeguards in place to be certain that clemency is not denied for

impermissible reasons.


11. THE APLICANT IS ENTITLED TO RELIEF FROM HIS DEATH
SENTENCE BECAUSE THE TEXAS CLEMENCY PROCEDURES
VIOLATE THE INTERNATIONAL CONVENTION ON HUMAN
RIGHTS UNDER ARTICLE SIX.


The applicant contends in specific that the provisions of The International

Covenant on Civil and Political Rights, Art. 6, provide for a substantially

different clemency procedure and review than the one currently in place.

Since the provisions, as mentioned before, are binding on the states through

the Supremacy Clause, they must be adhered to and implemented by relevant review of the courts or by enacting new rules.

Article VI, clause 2, the Supremacy Clause of the U.S. Constitution, provides, in relevant part:

> [A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the judges of every State shall be bound thereby, any Thing in the Constitution or Laws of the State to the contrary notwithstanding.

One leading treatise on constitutional law concludes that "unless treaties are contrary to the Constitution, they are equal in status to congressional legislation, and, as expressly provided in the text of the Constitution, the supreme law of the land." Nowak and Rotunda, Constitutional Law 217 (5th ed. 1995). It is clear, as a matter of international law, that federally organized countries have the obligation to ensure compliance with international human rights law at all levels of government: federal, state and local. This principle is embodied in the Supremacy Clause. The U.S. has now ratified a number of human rights treaties which